1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5

6    EDITH RAMIREZ, et al.,

7                    Plaintiffs,            NO. C06-0631 TEH

8          v.                              ORDER GRANTING IN PART
                                           AND DENYING IN PART
9    THE SALVATION ARMY, et al.,           DEFENDANTS' MOTIONS FOR
                                           SUMMARY JUDGMENT AND
10                  Defendants.             SETTING CASE
                                           MANAGEMENT CONFERENCE
11

12          This matter came before the Court on March 3, 2008 on Defendants' Motions for

13   Summary Judgment.  For the reasons set out below, the Motions are GRANTED IN PART

14   AND DENIED IN PART.

15

16   **INTRODUCTION/ FACTUAL BACKGROUND**

17          In this action, ten Plaintiffs bring numerous claims against their former employer, the

18   Salvation Army, and several individual defendants.   The Salvation Army is a non-profit

19   religious organization that operates a variety of social service programs, including the San

20   Francisco Adult Rehabilitation Center ("ARC").  The ARC provides rehabilitative services

21   for individuals with alcohol and substance abuse problems, and is funded largely by the

22   Salvation Army's eight Bay Area thrift stores.

23          Defendant Major Jack Phillips became the Administrator of the San Francisco ARC in

24   June, 2004.  Defendant Marlene Heller became the Director of Retail for the San Francisco

25   thrift stores in July, 2004.  Defendant Kimberly Vickery was the Personnel Director during

26   the relevant period.  Defendant Major Anna Phillips was the Director of Special Services for

27   the ARC.

28

Plaintiffs fall into two categories. The first category consists of former Salvation Army employees who were terminated as part of an alleged reorganization (or near the time of the reorganization) in late 2004, but not rehired by the Salvation Army: Florencia Alfonso, Charita Cachero, Digna Dacanay, Luz King, Antonio Pergamo, Lourdes Tangonan, Rebecca Valera, and Edith Ramirez.

According to the Salvation Army, the reorganization took place because Major Jack Phillips evaluated the San Francisco area operations and decided a reorganization was necessary to ensure its financial solvency.[1] He decided in August or September of 2004 which positions to eliminate. In all, he eliminated 24 positions, including all full-time sales associates, counselors, clothing sorters, bric-a-brac sorters, touch-screen operators, and collection center attendants. These positions were in Thrift Stores, collection centers, the warehouse, and rehabilitation and administration.

On November 30, 2004, the Salvation Army notified those employees whose positions were being eliminated because of the reorganization that they would be terminated effective December 14, 2004. As part of the reorganization, the Salvation Army posted openings for five full time positions (director of production, production assistant, retail manager, assistant retail manager, and lead sales associate) and eight part time positions (ranging from bric-a-brac sorter to collection center attendant). Phillips invited the employees who had been terminated as a result of the reorganization to reapply to the new open positions.

Of the 24 employees terminated as part of the reorganization, 20 reapplied. Of those, twelve were rehired; Plaintiffs Alfonzo, Cachero, Dacanay, King, Pergamo, Tangonan, and Valera were not. At the time they were terminated, Alfonzo was 60, Cachero 71, Dacanay 52, King 65, Pergamo 68, Tangonan 70, and Valera 67. All but Pergamo are Filipina. Pergamo is an Italian male with limited English-speaking abilities. Plaintiff Edith Ramirez was also terminated at approximately the same time after she returned from a medical leave with a release to work note the Salvation Army found inadequate. However, Ramirez was

---

[1] Plaintiffs raise numerous objections to Phillips' declaration ranging from hearsay to lack of foundation. These objections do not have merit and are OVERRULED.

also listed as an employee slated for termination in the reorganization. She is Filipina, and at the time she was terminated, she was 70 years old. The Salvation Army contends that these Plaintiffs were not rehired because of performance problems during their previous employment with the Salvation Army.

Plaintiffs disagree. They claim that they were all long-term employees of the Salvation Army with excellent performance records and no documented problems. They argue that in reality the Director of Retail Marlene Heller, who harbored discriminatory animus towards Plaintiffs, was the final decision-maker for rehiring, with Phillips merely rubber-stamping her recommendations.[2] In the time since she was hired on July 30, 2004, both Plaintiffs and several third-party witnesses – including a former store manager, John Boatman, a former sales associate, Sundie Waterdown, and a current employee, Remedios Agasaulio – heard Heller making comments that she wanted younger, more energetic employees. Around the time of the reorganization, Waterdown heard her say something to the effect of "Look, we have all these older Filipino women. What we need is to get young, energetic people in here like young college students." Waterdown Depo. 49-50. Plaintiffs also claim that after the reorganization, even though the Salvation Army rehired some of those it terminated, it hired "dozens" of younger workers to replace the Plaintiffs in the newly-created part-time positions.

Plaintiffs Alfonzo, Cachero, Dacanay, King, Pergamo, Tangonan, Valera and Ramirez assert claims for age, race, national origin, sex, and disability discrimination, harassment, failure to prevent discrimination and harassment, interference with FMLA rights, wrongful discharge in violation of public policy, and intentional infliction of emotional distress, in various combinations.

---

[2] As the Director of Retail, Heller supervised seven thrift stores in several cities, but spent most of her time at the largest store on Valencia Street in San Francisco. Defendants claim that she supervised only the thrift store employees, but Plaintiffs claim that at least on occasion, she gave instructions to warehouse employees. Tangonan Depo. 41-42 (Heller instructed Tangonan on how to price clothing).

1    The remaining two Plaintiffs are Donald Higgins and Robert Cousineau. Higgins was

2  hired as a Store Manager in anticipation of the grand reopening of the Valencia Street Store

3  on April 13, 2005. Higgins' duties as a store manager included opening and closing the

4  store, managing approximately 20 employees, and preparing the schedule. He claims that

5  although he disclosed during his interview that he had a back injury and was unable to lift, he

6  was often asked to lift heavy items during his 29-day tenure at the Salvation Army. Higgins

7  also claims he was constantly asked to "crack down" on older workers, and to be "more

8  aggressive" with them. Higgins Depo. at 75, 101.

9    Marlene Heller, Higgins's direct supervisor, was dissatisfied with his work and

10  documented numerous instances of inadequate performance. During the short time Higgins

11  worked at the Valencia store, she documented seven instances of inadequate or inappropriate

12  work, ranging form asking to leave early, to working too slowly, to falsifying a time record,

13  to allowing three employees to sit in the break room at the same time. Jack Phillips and

14  Anna Philips also testified that Higgins's work was inadequate and he did not properly

15  manage his employees.

16    On May 17, 2005, Higgins was terminated for "failure to meet Salvation Army

17  standards." Higgins testified that Phillips told him he was being "let go" because he had

18  failed to disclose his disability and because he had failed to "crack down on older workers."

19  Higgins Depo. at 103.

20    Robert Cousineau was hired on November 1, 2004, at age 61, to be a Residence

21  Manager for the ARC. As a Resident Manager, Cousineau lived on site, and was required to

22  manage the ARC house, supervise staff, and stock supplies. Cousineau testified that during

23  his interview, he told Heller, Phillips, Anna Phillips, and Philip Beebe, the Director of

24  Rehabilitative Services, that he could not lift heavy items and needed shoulder surgery, and

25  they responded it would not be a problem. Cousineau Depo. at 52-53.

26    Cousineau also alleges that he was asked to lift heavy items without a back belt. He

27  testified he heard casual comments about his age.

28    Between November, 2004 and March, 2005, Cousineau's supervisor Beebe (who was

4

older than Cousineau and disabled) documented various performance problems. In March, 2005, Jack Phillips indicated to Cousineau that he would likely not pass his probationary period, and offered him a transfer to a position as a Lead Sales Associate at the Valencia Street thrift store. He accepted.

Cousineau fared no better at the thrift store. While he worked there, Heller documented numerous instances in which his performance was substandard. On July 7, 2005, he was terminated for being absent for three days without calling in.

Cousineau and/or Higgins assert claims for age and disability discrimination, failure to accommodate their disabilities, harassment, retaliation, failure to prevent the foregoing, wrongful discharge in violation of public policy, and intentional infliction of emotional distress.

Defendants filed separate motions for summary judgment as to these groups of Plaintiffs.[3] Section I of this Order discusses the age, race, sex, national origin, FMLA, and disability claims of the eight Plaintiffs terminated as part of or close to the 2004 reorganization, along with the factual details relevant to each claim. Section II analyzes the age, disability, and retaliation claims of Cousineau and Higgins. Section III considers legal theories common to both groups (harassment, failure to prevent discrimination and harassment, wrongful discharge in violation of public policy, and intentional infliction of emotional distress) for which the relevant facts do not differ significantly.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is

---

[3] This Order refers to pleadings in the motion for summary judgment against Ramirez, Alfonzo, Cachero, Dacanay, King, Pergamo, Tangonan, and Valera with an "R" notation, and pleadings for the motion for summary judgment against Higgins and Cousineau with an "H" notation. (e.g, Opp. (H) at 9.)

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* at 322-23. However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the District Court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party meets its initial burden, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial" to defeat the motion. Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250.

**DISCUSSION**

**I.   SEPARATE CLAIMS OF ALFONZO, CACHERO, DACANAY, KING, PERGAMO, TANGONAN, VALERA AND RAMIREZ (FIRST MOTION FOR SUMMARY JUDGMENT)**

    **A.   Claim for Discrimination on the Basis of Disability in Violation of the ADA, 42 U.S.C. § 12101 *et seq.* by Plaintiff Ramirez (Fifth Cause of Action)**

Plaintiff Edith Ramirez alleges she suffered disability discrimination, in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*. SAC ¶¶ 192-196. Ramirez worked in the warehouse as a touch screen operator, a job which included hanging and cataloguing clothing. In August of 2004, she tripped and broke her shoulder on the way to work. She obtained a leave of absence until November 22, 2004.

On November 22, Ramirez returned with a note dated November 5, 2004, which stated her "estimated date of return to work" was November 22, 2004, but also circled the option stating that the patient had been instructed "Not to Return to Work." Ramirez Decl.

Exh. A. Defendant Vickery, the personnel director, told Ramirez that the letter did not release her to work, and that she should return with a doctor's note allowing her to return to work. Ramirez went immediately to the hospital, where she was told her doctor was only in the clinic on Fridays. Ramirez Depo. at 55:22-25. She informed Vickery of this fact. Several weeks later, on December 10, 2004, Ramirez went to her doctor to get another note. Ramirez Decl. ¶ 8. In her presence, a doctor's assistant called Vickery and told her that the release was "proper." That same day, the doctor's office faxed a clarifying letter, stating that the letter meant Ms. Ramirez was "cleared to return to work as of November 22, 2004." Ramirez Exh. B.

Ms. Ramirez testified that she still had pain in her shoulder as of the time of her deposition, in April, 2007, but no doctor has told her she is unable to work.

Ms. Ramirez has not shown she is disabled within the meaning of the ADA. Section 12102(2)(A) of the ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of the individual." "[A] temporary injury with minimal residual effects cannot be the basis for a sustainable claim under the ADA." *Sanders v. Arneson Products, Inc.,* 91 F.3d 1351, 1354 (9th Cir. 1996). The appendix to the relevant ADA regulations states that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R. Part 1630 App., § 1630.2(j).

Plaintiff claims that her injury substantially limited her major life activity of lifting. Disability regulations do list "lifting" as a major life activity. 29 C.F.R. Pt. 1630, App. § 1630.2(I). But she must also show she is "substantially limited" in that activity:

> In general, "substantially limited" refers to the inability to perform a major life activity as compared to the average person in the general population or a significant restriction "as to the condition, manner, or duration" under which an individual can perform the particular activity. 29 C.F.R. § 1630.2(j)(1)(I)-(ii).

*Thompson v. Holy Family Hosp.* 121 F.3d 537, 539-40 (9th Cir. 1997).

Ramirez has offered no evidence to support her claim that her lifting was substantially limited. The doctor's note which Ramirez claims released her to work had another option that the doctor could have circled, but did not – "Return to work and resume Modified Duties with the following limitations ... Lift/Carry." Ramirez Exh. A. Even though she has testified that she has "pain" in her shoulder and her husband didn't want her to work, Ramirez Depo. at 60, she also testified that she was "able to lift, but not much." *Id.* at 115. Moderate limitations on major life activities do not qualify an individual as disabled under the ADA. "To hold otherwise could expand the ADA to recognize almost every working American as disabled to some degree." *Orr v. Wal-Mart Stores, Inc.,* 297 F.3d 720, 724 (8th Cir. 2002).

Summary judgment is GRANTED as to Ramirez's ADA claim.

**B.     Age, National Origin, Race, and Sex Discrimination Claims by Plaintiffs Alfonzo, Cachero, Dacanay, King, Ramirez, Tangonan, and Valera (First through Fourth Causes of Action)**

The Salvation Army moves for summary judgment on Plaintiffs' claims that it discriminated against them on the basis of race,[4] national origin,[5] sex,[6] and age.[7]

To defeat a motion for summary judgment in a disparate treatment discrimination case, a plaintiff may produce direct or circumstantial evidence demonstrating that a

---

[4]   The First Cause of Action, by Alfonzo, Cachero, Dacanay, King, Ramirez, Tangonan, and Valera alleges defendant Salvation Army discriminated on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-e *et seq.*, 42 U.S.C. § 1981, and Article I, Section 8 of the California Constitution.  SAC ¶¶ 172-176.

[5]   The Second Cause of Action, by Plaintiffs Alfonzo, Cachero, Dacanay, King, Ramirez, Tangonan, Valera, and Pergamo, alleges the Salvation Army discriminated on the basis of national origin, in violation of Title VII and Article I, Section 8 of the California Constitution.  SAC ¶¶ 177-181.

[6]   The Third Cause of Action, by Plaintiffs Alfonzo, Cachero, Dacanay, King, Ramirez, Tangonan, and Valera alleges the Salvation Army discriminated against them on the basis of sex, in violation of Title VII and Article I, Section 8 of the California Constitution.  SAC ¶¶ 182-186.

[7]   The Fourth Cause of Action, by Plaintiffs Alfonzo, Cachero Cousineau, Dacanay, King, Pergamo, Ramirez, Tangonan, and Valera alleges the Salvation Army discriminated against them on the basis of age in violation of the Age Discrimination in Employment Act, ("ADEA") 29 U.S.C. §§ 621 *et seq.*

discriminatory reason more likely than not motivated the defendant's decision, or, alternately, may rely on the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005). Under that framework, plaintiff must first make out a *prima facie* case of discrimination. *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1281 (9th Cir. 2000). The *prima facie* case then creates a rebuttable presumption of discrimination, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir.2002), *citing Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). If the employer meets this burden, the presumption of unlawful discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993), and plaintiff must produce sufficient evidence to raise a triable issue of fact as to whether the proffered nondiscriminatory reason is a mere pretext for discrimination. *Dominguez-Curry*, 424 F.3d at 1037.

Here, Plaintiff claims that Marlene Heller's comments constitute "direct evidence" of discrimination sufficient in and of themselves to raise a triable issue of fact. Because these comments serve as evidence of pretext, they are discussed in the context of the *McDonnell Douglas* burden-shifting analysis below.

### 1. *Prima Facie* Case

To make out a *prima facie* case in the context of a reorganization, Plaintiffs must demonstrate that they were "(1) members of the protected class (at least age 40); (2) performing their jobs satisfactorily; (3) discharged; and (4) replaced by substantially younger employees with equal or inferior qualifications." *Coleman,* 232 F.3d at 1281 (ADEA); *see also Washington v. Garrett,* 10 F.3d 1421, 1434 (9th Cir. 1993)(in Title VII case, plaintiff must show "(1) that she belongs to a protected class; (2) that she was discharged from a job for which she was qualified; and (3) that others not in her protected class were treated more favorably"). Proof that the employee was replaced is not always required. *Jamal v. Wilshire Management Leasing Corp.,* 320 F.Supp.2d 1060, 1069 (D.Or. 2004)(citing *Wallis*, *supra*, *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990), and *Washington*, *supra*).

For allegations involving refusal to rehire from a layoff, each Plaintiff can make out a *prima facie* case by showing he or she belongs to a protected class, that during the reorganization he or she applied for but did not receive another position, that a younger person with similar qualifications received that position, and that he or she was qualified for that position. *Sakellar v. Lockheed Missiles and Space Co.,* 765 F.2d 1453, 1455 (9th Cir. 1985) (ADEA); *Wynn v. National Broadcasting Co., Inc.*, 234 F.Supp.2d 1067, 1097 (C.D. Cal. 2002)(same). At summary judgment, the degree of proof necessary to establish a prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (*quoting Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994)).

Two elements are clear: Plaintiffs were members of protected classes (all but Pergamo were Filipina women over age 50, and Pergamo was an Italian male over age 50),[8] and they were terminated in the reorganization and not rehired.

The Salvation Army does not argue that Plaintiffs were unqualified. It claims only that they were not *rehired* because of their substandard performance, so that "they were not *more* qualified than others." Defendants' Memorandum in Support of Motion for Summary Judgment ("Motion MPA") (R) at 19 (emphasis added). At oral argument, Defendants' counsel argued that Plaintiffs had not shown they were as or more qualified than the persons hired into the part-time positions. But Plaintiffs have offered the testimony of their former direct supervisors (discussed more fully below) that they were performing their duties in a satisfactory manner. *See, e.g.,* Nieva Damien Depo. at 66-67 (Damien surprised that

---

[8]    Defendants argue that Pergamo admitted at deposition that he believed his termination had "nothing to do" with his being Italian, Exh. L, Pergamo Depo. at 68-69, so the Court should grant summary judgment on his national origin discrimination claim. In opposition to the motion, however, Pergamo declares that he was confused at the deposition and thought he was being asked if the Salvation Army told him he was terminated because he was Italian. Pergamo Decl. ¶ 10. Throughout their depositions, various Plaintiffs state that they don't know why they were terminated, or state that protected class status was not a factor in their terminations. For example, Plaintiff Alfonzo admitted at deposition that she did not believe her leave was a factor in the Salvation Army's decision to eliminate her position. Alfonzo Depo. at 96-97. Because the Plaintiffs are clearly unsophisticated, and often speaking through interpreters, the Court will not give their statements on the ultimate legal issues any weight in the context of these summary judgment motions.

Alfonzo, Cachero, Pergamo and Valera were not rehired because they were "more than qualified.")   Given this evidence, and the Plaintiffs' collective years of experience in their positions, the Court finds that the Plaintiffs have raised a triable issue of fact about whether they were as qualified as the new hires.[9]

The Salvation Army clearly disputes that other employees outside the protected classes were treated more favorably.  Twenty four employees were terminated, 20 applied for rehire, and 12 were selected.  The Salvation Army argues that of those terminated, over half of the Asian/Pacific Islanders and well over half of the women and workers over 40 were rehired.[10]   Plaintiffs, on the other hand, argue that the relevant question is who filled *all* the part-time positions created to replace Plaintiffs' old positions  – not simply who of the terminated individuals were rehired.  Plaintiffs' Opposition ("Opp.") (R) at 5; 16.  Plaintiffs are entitled to make their *prima facie* case by showing they were replaced with younger employees or employees not in the protected class.  *Coleman*, 232 F.3d at 1281

### a.     Age Discrimination

As to age discrimination, Plaintiffs have produced at least some evidence that younger employees were hired into the newly-created part-time positions.  Plaintiff Cachero testified that Heller brought young people into the store, told Cachero they were students she had hired, and asked Cachero to "train them and teach them how to work the register."  Cachero Depo. at 38-39.   Remedios Agasaulio, a current employee of the Valencia store, testified that the Salvation Army hired new sales associates who were in their twenties.  Agasaulio Depo. at 25-26; *see also* Waterdown Depo. at 52-53 (Waterdown, a former sales associate, walked into Valencia street store several times after it was remodeled; "I really can't say [the

---

[9]   Although Defendants repeatedly stated at oral argument that Plaintiffs had failed to show they were *more* qualified than the new hires, they are not required to do so to make out a *prima facie* case.

[10]   Three of four employees in their 70's were rehired; overall, of the 12 rehired, 10 were over 40:  3 were in their 40's, 2 in their 50's, 2 in their 60's, and 3 in their 70's.  Phillips Decl. (R) ¶¶ 4-5.  Nine of 14 women were rehired, while only half of males who applied were rehired.  *Id.*  Of 11 Asian/Pacific Islanders who applied, six were rehired, and 11 of the 12 employees rehired were minorities.  *Id.*

new employees'] ages, but they were definitely younger. Forty would probably be close or younger.")[11]

Neither party has submitted any hard data about the age, race, or gender of employees hired to fill the newly-created part-time positions (or even the number of part-time positions created). But the testimony of these three witnesses is enough to make out a *prima facie* case at this stage. *See Wallis,* 26 F.3d at 889 ("very little" evidence required to create a *prima facie* case).

### b. Race/National Origin and Sex Discrimination

The Plaintiffs have not made the same *prima facie* case for race/national origin or sex discrimination. They have simply failed to produce evidence showing those not in the protected class were treated more favorably. Plaintiffs point to no evidence that the new employees hired into the part-time positions were of a different race/national origin, or were male. The only relevant evidence the Court has identified in the record is the statement by a former supervisor that it looked to him as though the new crew included "a little bit of everybody," including Filipinos and African Americans. Boatman Depo. at 45. The race and sex breakdown of those rehired do not indicate disparate treatment. Half of the men were rehired, but a greater proportion of women were rehired (nine of 15). Five of nine non-Asians were rehired (55%), and six of twelve Asian/Pacific Islanders were rehired (50%). These differences are far too small to raise an inference of discrimination. *See, e.g., Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1423 (9th Cir. 1990)(showing that 73.5% of workers over 50 terminated in RIF, while only 34.1% of those 40-49 and 28.2% of those under 40 were terminated is insufficient; to show a *prima facie* case of disparate treatment based solely on statistics plaintiffs must "show a stark pattern of discrimination unexplainable on grounds other than age.")

---

[11] On the other hand, Plaintiff Higgins testified that in 2005 (after the reorganization), most of the employees he supervised at the Valencia Street store were over 40, and many were Filipino. Higgins Depo. at 17-18.

At oral argument, Plaintiffs' counsel conceded that there was no evidence of a *prima facie* case of gender discrimination. Plaintiffs argued that Marlene Heller's comment that the Salvation Army had "all of these older Filipino women," Waterdown Depo 49, 51, served to make out a *prima facie* case of race/national origin discrimination. This one comment, standing alone, is insufficient to raise an inference of race or national origin discrimination.

Because Plaintiffs Alfonzo, Cachero, Dacanay, King, Pergamo, Tangonan, Valera and Ramirez have not made out a *prima facie* case of disparate treatment on the basis of sex, race, or national origin, summary judgment is GRANTED as to their claims for sex, race, and national origin discrimination..

### 2. Legitimate, Non-Discriminatory Reason For Termination and Failure To Rehire

The Salvation Army claims that Plaintiffs Alfonzo, Cachero, Dacanay, King, Pergamo, Tangonan, and Valera were released as part of a reduction in force, and that Plaintiffs were not rehired because of their poor performance records. A reorganization is a legitimate, non-discriminatory reason for discharging an employee. *Hawkins v. Home Depot USA, Inc.,* 294 F.Supp.2d 1119, 1123 (N.D.Cal. 2003), *citing Coleman*, 232 F.3d at 1282. Poor work performance is also a legitimate, non-discriminatory reason for an adverse employment action. *Jones v. Bayer Healthcare LLC*, 2007 WL 879020, *5 -*6 (N.D. Cal. 2007)(failure to promote); *Sneddon v. ABF Freight Systems,* 489 F.Supp.2d 1124, 1130 (S.D.Cal. 2007)(termination); *Bradley v. Harcourt, Brace & Company*, 104 F.3d 267, 270 (9th Cir.1996)(termination).

The Salvation Army offered a legitimate, non-discriminatory reason for the termination and failure to rehire of each Plaintiff. It asserts that Alfonzo, Pergamo, Valera, Cachero, Dacanay, and King had substandard performance or poor attitude – although it offers no documentation of their performance, and relies solely on the testimony of Marlene Heller, the Director of Retail who supervised the store managers who in turn supervised the thrift store employees, or Jack Phillips.[12] The Salvation Army claims it has no record that

---

[12] Specifically:

(continued...)

13

Lourdes Tangonan, a touch-screen operator at the warehouse,  reapplied for a position after

the reorganization.  Finally, Defendants assert that Ramirez was terminated for job

_____

(...continued)

**Florencia Alfonzo**

Alfonzo worked at the Salvation Army for nearly the entire period between 1986 and 2004. At the time she was terminated, she was 60 years old and employed as a sales associate in a thrift store.  In about November, 2004, she took family leave to care for her husband, and was notified that her position had been eliminated while she was on leave.

The Salvation Army contends she was not rehired because of poor work  performance.  The only evidence in support of this claim comes from the Deposition of Marlene Heller.  Heller testified she told Phillips that Alfonzo had "not good friendly customer service," that she didn't count money well, that she wasn't very efficient, didn't place items in the bag while ringing up the purchase or "give the customer a blow by blow account of what she is purchasing," or thank the customer. Heller Depo. at 48, 50-51.  Heller had at least nine conversations with Alfonzo about her work between July and November of 2004.  Id. at 59, 67.

**Antonio Pergamo**

Antonio Pergamo worked as a Sales Associate at the Valencia Street store.  At the time of the reorganization, he was 68.  He spoke little English.  Heller testified that she felt his performance was poor because he could not communicate with the public, and could not operate the cash register with ease and therefore was not efficient.  She spoke to him more than 5 times about his performance but it did not improve.

**Rebecca Valera**

Rebecca Valera was 67 years old at the time of the reorganization.  Heller testified she was not rehired because she "didn't seem willing to learn," was not customer focused, did not count cash well and was not efficient.  Heller counseled Valera about customer service, but Valera did not improve.

**Charita Cachero**

Cachero was 71 years old at the time of the reorganization, and had worked as a sales associate for nine years.  After the reorganization, she applied for a Lead Sales Associate position, but was not hired because she could not count cash efficiently and did not have customer service skills.  Heller spoke to Cachero about her performance issues, but Cachero was "resistant" and did not improve.  Cachero herself thought there was "a possibility" she was removed from her job because of an incident in which she was counseled for staying at the cash register.

**Digna Dacanay**

Dacanay was a bric-a-brac sorter in the warehouse and was 53 years old and had worked at the Salvation Army for a year at the time of the reorganization.

The Salvation Army asserts that Dacanay was not rehired because she had poor work performance and because there was "documentation that co-workers reported she had been stealing," Phillips Decl. ¶ 7 (although the documentation is not offered in support of the motion).

**Luz King**

King was a 65 year old bric-a-brac sorter at the time of the reorganization.  The Salvation Army argues King was not rehired because of her "poor attitude" and because she was disciplined for dishonesty and improper conduct in January of 1993.  Phillips Decl. ¶ 8.

14

abandonment pursuant to the Salvation Army's policy that an employee is considered "self-terminated" after three consecutive days of unreported or unexcused absence (as set out in section I.A *supra*).

### 3. Pretext for Discrimination

#### a. Plaintiffs' Work Performance and Rehiring Process

Plaintiffs offer varying amounts of evidence relating to each employee to rebut the Salvation Army's ostensible justifications for termination and failure to rehire. The Valencia Street thrift store employees – Alfonzo, Pergamo, Valera, and Cachero – submitted evidence that they had satisfactory or excellent personnel evaluations. Their immediate supervisors testified that they were good employees.[13] Moreover, Heller never asked their supervisor, John Boatman, what he thought of their performance, shared her concerns over

_____

[13]    Specifically, Plaintiffs offered the following evidence:

**Florencia Alfonzo**
      Alfonzo's February, 2004 Personnel Evaluation rated her "satisfactory" (the highest rating) on each criterion and "excellent" overall, noting "she's a very good employee – hard working and ready to help." Alfonzo Decl. Exh. A. John Boatman, Alfonzo's direct supervisor at the Valencia Street store, testified that she was a "great" employee. Nieva Damien, the Valencia Street store manager until 2003 (who later again worked there for several weeks in 2005), similarly testified that she was "very good worker, very loyal, very dedicated." Damien Depo. at 59. Heller herself, when asked whether she thought she needed to direct the manager to "write her up, give her a verbal warning," fire her, move her to a different position, or take any other steps "as the director of retail in light of her not responding to you, responded "[o]ther than to think that this was part of a long-term process, no." Heller Depo. at 66.

**Antonio Pergamo**
      Pergamo counters that his lack of English skills did not affect his ability to do his job much because his duties included setting up the store, setting up the clothing, and assisting the manager. Boatman confirmed that his "main task" which took over half his time was stocking the clothing side of the store, Boatman Depo. 26, 60, and stated his job performance was "very good" and "excellent." Boatman Depo. at 60. Damian, Pergamo's previous supervisor, stated he received positive performance evaluations and was a "good worker."

**Rebecca Valera**
      Boatman testified that Valera's job performance was "good," and rated her an "excellent" employee in April of 2004. Damien testified she had "positive performance" and received "positive performance evaluations." Valera claims she was never counseled about her performance in the months before the termination.

**Carita Cachero**
      Boatman testified that Cachero's "job performance was very good" and her "customer service at the cash register was excellent." Damian testified she had good performance evaluations.

1    the employees' work performance with him, asked him to fill out or sign disciplinary forms

2    for them, or told him to train them more. Boatman Depo. at 57-59, 61-64.

3        Evidence as to the warehouse employees was less compelling. Dacanay did not

4    submit her performance evaluation or testimony of her supervisor; she offers only her own

5    declaration that she was not counseled on her performance and received good performance

6    evaluations during her tenure at the Salvation Army. Luz King, on the other hand, offered

7    performance evaluations from 2004, 2000, 1997 and 1996 which show that she was

8    consistently given the highest possible ratings for "attitude toward job" and "excellent" total

9    employee evaluations.

10       Apart from these plain rebuttals, there are several other reasons to think that both the

11   reorganization and the poor performance rationales were pretexts for age discrimination. The

12   Salvation Army's story about when and how it made the rehiring decision is filled with

13   inconsistencies. The Salvation Army describes a neutral-sounding rehiring process with

14   applications, interviews, and input from supervisors. It maintains that Jack Phillips was the

15   ultimate decision maker during the rehiring process; he was the only person who could

16   "approve a hire or approve a termination," Phillips Depo. at 135, and he "made the decision"

17   about which individuals would be rehired after the reorganization. *Id.* at 158. Phillips

18   testified that he made the rehiring decision based on feedback he received about applicants'

19   rehiring interviews, personnel files, applications, and comments from their current or former

20   department heads. According to Phillips, Heller (the Director of Retail), Jerry Callen (the

21   Director of Production) and Phil Beebe (Director of Rehabilitative Services) had input for

22   hiring in their respective departments, and for any applicant who had worked in their

23   departments, making notes on each candidate in the application file; Kimberly Vickery (the

24   Personnel Director) reviewed each application and conducted an initial interview; and each

25   director "discussed individual employee performance" with Phillips. *Id.* at 160-169; 183-

26   185.

27       On the other hand, Phillips also stated at deposition that "the reorganization may have

28   taken place in the winter months, but it was discussed and the plans were formulated much

16

earlier." Phillips PMK Depo. at 17-18. "[D]etermination of eligibility for rehire was made between August and October of 2004." *Id.* at 32. Nonetheless, the exhibits to Phillips' declaration make it unclear when the Salvation Army arrived at a definitive list: one undated letter lists only Plaintiffs Alfonzo, Dacanay, Pergamo, Ramirez, and Tangonan as slated for layoff but "eligible to reapply for a part-time position," Phillips Decl. Exh. A at 6, but later documents list all the Plaintiffs at issue here. *Id.* Exh. B, C.

Marlene Heller testified that in 2004, when she discussed eliminating positions with Phillips,

> We looked at a store by store individual employee by individual employee, what is the job of this person. Is it necessary to have them work this number of hours. And then is this specific person performing well in that job.

Heller Depo. at 46. After applications for the new part-time positions were submitted, Heller had two meetings with Phillips about whom to rehire. *Id.* at 118. It was Heller who expressed the opinion that the work of Alfonzo, Cachero, Pergamo and Valera was substandard and who recommended that they should not be rehired, and Phillips followed her recommendations:

> Q. Do you believe that in your conversation with Major Phillips, that a decision was made as to whether or not to rehire Ms. Alfonzo?
>
> A. Yes.
>
> Q. Do you recall what that decision was?
>
> A. Not to rehire.
>
> Q. Do you recall if that was your recommendation?
>
> A: Yes, it was my recommendation.

Heller Depo. 124-125; *see id.* at 125-26 (same for Cachero); 126-27 (Pergamo); 127-28 (Valera). Heller claims she did not talk with Phillips about Dacanay, and does not recall whether King was discussed. *Id.* at 128.

Phillips "does not remember" reversing, or even considering reversing, Heller's recommendations. Phillips PMK Depo. at 50. He did not review documents, ask follow up questions, or further investigate her recommendations on whom to hire. *Id.* Phillips stated at

1    one point that Heller was the final decision-maker with respect to hiring for the part time

2    sales associate positions, *id.*. at 49, but at another point said he had "input" into the process.

3    *Id.* at 38.

4          Whether other managers or supervisors were involved in the early determination about

5    who was "eligible for rehire" – or in any ostensible discussions about performance – is

6    unclear and/or disputed.  Phillips said that Callen, the supervisor for the four warehouse

7    employees, was involved in discussing rehires in August through October of 2004 (but not

8    December 2004, during the rehiring process), Phillips PMK Depo. at 15-16, and that he

9    relied on Jerry Callen and Joseph Velaso for input on Dacanay's poor work performance[14]

10   and Luz King's poor attitude and 1993 discipline.  Phillips Decl. ¶¶ 7-8.  But Callen himself

11   testified that he was not involved in decision-making about the reorganization or meetings

12   about whom to rehire at all.  Callen Depo. at 8, 18, 23. He explicitly stated he was never

13   asked his opinion of Luz King's work performance in 2004.  *Id.* at 22-23.  (The Salvation

14   Army's reliance on Luz King's 10-year old discipline as a rationale for refusing to rehire her

15   is also suspect.)

16         According to Phillips, Vickery, the Personnel Director, reviewed each application as

17   part of the rehiring process.  But Vickery did not remember having knowledge about how the

18   decision was made to rehire someone.  She attended a meeting with Phillips, Heller, Callen,

19   and Velasco around the time of the reorganization where final decisions were made as to who

20   would be rehired into the part time positions.  She does not recall any discussion that any

21   individual Plaintiff was "not rehireable" because of poor performance or attitude.  Vickery

22   Depo. at 99-104.

23         Phillips also stated he relied on feedback about interviews to make the rehiring

24   decision.  But each Plaintiff testified he or she was not interviewed during the rehiring

25

26   _____

27   [14]  Although Phillips said there was "documentation" of allegations that Dacanay was stealing, that documentation was not offered in support of the summary judgment motion.  None of the poor performance on which the Salvation Army relies was ever documented.  *See, e.g.,* Heller Depo. at

28   74, 77.

1   process, and Phillips also admitted that individuals "who it was determined would not be

2   eligible for rehire" were not interviewed. Phillips Depo. at 32.

3       Plaintiffs have raised a triable issue of fact as to whether the termination and rehiring

4   decisions turned in large part on Marlene Heller's input – even for the employees she did not

5   directly supervise.

6                   **b.    Heller's "Younger Workers" Comments**

7       Plaintiffs submit evidence that Heller made multiple comments that she wanted

8   younger workers. John Boatman, a former store manager at the Valencia Street store,

9   testified that on several occasions after she began working on July 30, 2004 but before

10  September 2004, he heard Heller comment that the older crew worked too slowly and she

11  wanted a young, energetic crew. Boatman Depo. at 45-48 (Heller said the "older crew works

12  too slow. She'd much rather have a crew that's extremely young in here because they would

13  work faster.")

14      Sundie Waterdown worked as a sales associate at the Valencia Street store starting in

15  2003. He overheard Heller tell someone else that "there's a lot of elderly people here. We

16  need to get younger, more energetic people in this store." Waterdown Depo. at 32. About

17  two weeks later, Waterdown overheard Heller make the comment that they had "older

18  Filipino women," *Id.* at 51, and needed younger, more energetic workers, expressing a desire

19  for "college students." *Id.* at 45-52.

20      Remedios Agasaulio is a current employee of the Valencia Street thrift store. She

21  testified that Heller told her in about November or December of 2004 they were "hiring some

22  people who were young and energetic."

23      Plaintiff Alfonzo heard Heller say she wanted younger and more energetic workers.

24  Alfonzo Depo. at 69-70. Heller brought in the new recruits and told Cachero they were

25  younger and more energetic. Cachero Depo. at 39. At her own deposition, Heller evaded

26  questions about whether she had made such comments.

27      Q:      Okay. Do you recall ever talking to Florencia about the need to hire younger
                workers in the Salvation Army San Francisco store?
28

19

A.    To hire younger workers?  Can you rephrase that?

Q:    Do you recall talking to Florencia about the need to have younger workers
      working in the San Francisco store?

A:    Can you put it another way?

Q:    Do you ever recall talking to Florencia about your opinion that younger
      workers would work more enthusiastically or with more energy, if they worked
      in the San Francisco store?

A:    No.

Heller Depo. 187-188.  *See also* Cousineau Depo. 65-66 (Heller asks "what are you, old?");

Higgins Depo. at 75 (Heller told him to "crack down" on older employees).

This evidence of Heller's discriminatory animus is certainly sufficient, in combination

with the other evidence above, to raise a triable issue of fact as to whether the adverse

employment actions against Alfonzo, Pergamo, Cachero, Dacanay, King, and Valera were

motivated by age discrimination.[16]  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530

U.S. 133, 151-152 (2000)(employer not entitled to summary judgment where, in addition to

establishing *prima facie* case and raising jury issue as to falsity of employer's proffered

rationale, person who could influence final decisionmaker said that plaintiff "was so old [he]

must have come on the Mayflower" and was "too damn old to do his job").  Although the

Salvation Army cites numerous cases holding that "stray remarks" unrelated to the allegedly

discriminatory employment decision are insufficient to raise an inference of discrimination,

*see, e.g., Schaffer v. Glencoe Park District*, 256 F.3d 616, 622-23 (7th Cir. 2001), many of

the comments at issue here *were* clearly related to the reorganization and rehiring ("hiring

some people who are young and energetic").

Even if Heller was not the direct decisionmaker for Plaintiffs Tangonan, Dacanay,

---

[16]  Plaintiffs also claim that Heller's comments are "direct evidence" of discriminatory animus
sufficient to deny summary judgment without applying the *McDonnell Douglas* burden-shifting
framework – "evidence of conduct or statements by persons involved in the decision-making
process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to
permit the *fact finder* to infer that that attitude was more likely than not a motivating factor in the
employer's decision."  *Enlow v. Salem Keizer Yellow Cab Co, Inc*., 389 F.3d 802, 812 (9th Cir.
2004).  However, because Plaintiffs survive summary judgment under the *McDonnell Douglas*
framework, the court need not decide whether this evidence, standing alone, creates a triable issue of
fact.

King, and Ramirez, she discussed the reorganization and who was eligible for rehire with Phillips "job by job" between August and September, 2004, and Plaintiffs have raised a triable issue of fact about whether she was able to influence Phillips when he made the decisions about whom to rehire. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998)(discriminatory statements by person who played "meaningful role" in or who may have influenced decision at issue relevant to motive); *Swanson v. Leggett & Platt*, 154 F.3d 730, 733 (7th Cir. 1998)(comments by person who influenced decision-maker's decision are imputed to the latter).

There is also a triable issue of fact as to whether the rationale for Ramirez's dismissal was pretextual. As set out in section I.A above, on the day Ramirez was to return to work – November 22, 2004 – she brought Vickery a letter from her doctor dated November 5, 2004, which stated she was not to return to work but also listed her return to work date as November 22, 2004. Vickery interpreted the letter as meaning Ramirez could not return to work, and then considered Ramirez "self-terminated" pursuant to Salvation Army policy when she did not return with a different work release within three days. Ramirez argues that Vickery's misreading of her doctor's note was pretextual.

Although the Salvation Army argues that "Edith Ramirez was not discharged as part of the reorganization," Motion MPA (R) at 19, Ramirez had, in fact, been chosen for termination by the time she failed to return to work. *See* Phillips Decl. Exhs. A, C (listing employees whose jobs would be eliminated). At that point, she was 70 years old. Phillips testified that the decision of whose jobs would be eliminated (and who was eligible for rehire) was made months before. These facts, coupled with Heller's comments, raise a triable issue of fact as to whether Vickery's misreading of the ambiguous note was a pretext for age discrimination.

Whether Plaintiff Tangonan has shown pretext is a far closer question. At her deposition, Tangonan at one point stated she did not remember if she reapplied, and at another stated she did reapply. Tangonan Depo. at 44, 59. In opposition to the motion, she declares that although she could not remember reapplying for her position during her

21

1  deposition, she now remembers reapplying in early December 2004. Tangonan Decl. ¶ 5.

2  Defendants argue that the Court should disregard her declaration because "a party cannot

3  create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy*

4  *v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991). But the rule is limited to "sham"

5  testimony, and contradictory testimony is not a "sham" if it is the result of a mistake or

6  honest discrepancy. *Id.* at 267.

7       Whether the Salvation Army received an application for Tangonan is a disputed

8  factual issue. Evidence that Heller had criticized Tangonan's pricing of items, Tangonan

9  Depo. at 43, and that Heller and Phillips discussed each position "job by job" to determine

10 whose jobs to eliminate before the reorganization, together with the slender evidence that the

11 terminated workers were replaced with younger employees, is sufficient to create a triable

12 issue of fact as to whether Tangonan's termination and the failure to rehire her was motivated

13 by discriminatory animus.

14             **c.     Statistical Evidence of Age Discrimination**

15      The parties spend significant time arguing over the admissibility and relevance of the

16 Declaration of David Friedland, an expert in Industrial/Organizational psychology.

17 Friedland noted that only 45% of those over 60 were rehired, while 78% of those under 60

18 were rehired. *Id.* ¶¶ 10-11. Plaintiffs offer this analysis, together with other statements in

19 Friedland's declaration, as evidence that the failure to rehire was discriminatory.

20      Defendants moved to strike the Friedland declaration and objected to it on several

21 grounds.[18] The Court hereby SUSTAINS the objections to ¶¶ 9, 12, 15, 17, 18, 19, the

22 "adverse impact" portion of ¶ 10.[19] Many of Defendants' objections have merit. Friedland

23 may not offer an opinion that the reorganization had an "adverse impact" on older workers

24 (assuming the phrase is used as a term of art) because Plaintiffs have pled solely a disparate

25 treatment theory. *See* Friedland ¶ 10 (listing "adverse impact ratio"). Friedland's declaration

26 

27 _____
   [18]   The Court ruled that it would treat the motion as an objection to Friedland's Declaration.

28 [19]   Moreover, the Court has not relied on ¶¶ 13, 14, or 16, which simply restate facts or allegations
   asserted elsewhere.

also contains impermissible opinions/conclusions on questions of law. *Id.* ¶¶ 9, 17, 19. Much of the declaration lacks foundation, *id.* ¶ 17, or is not "based upon sufficient facts or data," Fed. R. Evid. 702(1), *id.* ¶ 15 (opining that the results of the rehire interview process "may have perpetuated an age bias," when Plaintiffs themselves claim they "were not interviewed for these positions." Opp. (R) at 11, citing depositions of Alfonzo, Dacanay, King, Pergamo, Tangonan, and Valera). Much of the declaration restates other evidence, offering argument in the guise of expert opinion, *id.* ¶¶ 14, or vague statements such as "the type of subjective process used" to choose employees for rehire "is one that is susceptible to bias." ¶ 15.

Finally, defendants object to Dr. Friedland's "statistical methodology." Dr. Friedland explicitly declined to analyze the statistical significance of the rehire data because of the small sample size. *Id.* ¶ 11. As Friedland acknowledges, his analysis involves only "basic arithmetic," Suppl. Friedland Decl. at 2 – five of the twelve rehired were over 60, and 7 were under 60. This is not the stuff of expert opinion. *See* Fed. R. Evid. 702 (expert can testify to "specialized knowledge that will assist the trier of fact to understand the evidence"). Accordingly, Dr. Friedland's opinions about these simple ratios are not admissible as expert testimony.

The question remains, however, what significance the Court should give to the bare race and age breakdowns of the persons rehired. Defendants argue that it is improper for the Court to consider the percentage of persons over 60 versus those under 60 because the court cannot rely on an analysis of a "subgroup" of the protected category to find discrimination. But the cases on which it relies are analytically distinguishable; they either involve disparate *impact* claims, *E.E.O.C. v. McDonnell Douglas Corp.*, 191 F.3d 948, 950-51 (8th Cir. 1999); *Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2nd Cir. 1997), or a plaintiff trying to show a disparate impact on a protected class by limiting analysis to only one job category within that class. *Beale v. GTE California*, 999 F.Supp. 1312, 1323 (C.D. Cal. 1996). Plaintiffs clearly can claim they were discriminated against in favor of younger workers, even if those younger individuals fall within the protected class. *See O'Connor v.*

*Consolidated Coin Caterers Corp.*, 517 US 308, 312-313 (1996)(ADEA bans discrimination "because of age," not discrimination because worker is over 40; prohibited discrimination can include discrimination against older worker even if replacement worker is over 40); *McDonnell Douglas Corp.*, 191 F.3d at 952 (discrimination against workers over 55).

Although the Plaintiffs can properly compare treatment of those over and under 60, they have offered no evidence that the age disparities here are statistically significant.[20] As the Defendants' expert, Dr. Gregory Mitchell, points out, statistical evidence can only support an inference of discrimination after an analysis that both controls for other possible differences in the sample and is statistically significant. Mitchell Decl. ¶ 8. Courts have repeatedly rejected reliance on statistics where those elements are absent. *See, e.g., Coleman*, 232 F.3d at 1283 (to raise a triable issue of fact regarding pretext, statistics "must show a stark pattern of discrimination unexplainable on grounds other than age," and statistical analysis must factor in other pertinent variables); *Pottenger v. Potlatch Corp.* 329 F.3d 740, 748 (9th Cir. 2003)(statistics that take into account only two variables – termination and age – are treated "skeptically" when they fail to take other relevant variables into account); *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1272 (9th Cir. 1981) (considerations such as small sample size can detract from value of statistical evidence).

But even if the numerical evidence is insufficient to create a triable issue of fact on its own, it can "still remain relevant to the issues in dispute." *Obrey v. Johnson*, 400 F.3d 691, 695-96 (9th Cir. 2005). Objections that the statistical evidence fails to take into account relevant factors or is based on small sample size go to the weight, not the admissibility of the evidence. *Id.*

---

[20] While each side tries to parse the data in a manner favorable to its cause, possibly the most probative statistic – the age of the workers before the reorganization and after – is absent. *See Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423 (9th Cir. 1990)(examining average age of employees before and after a reorganization); *E.E.O.C. v. McDonnell Douglas Corp.*, 191 F.3d 948, 952 (8th Cir. 1999)(relevant statistic is difference in the percentage of older employees in the work force before and after the RIF); see also "Proof of Discrimination Under Age Discrimination in Employment Act," 44 *AmJur Proof of Facts* 3d 79 § 34. Plaintiffs argue broadly that Defendants' statistics about who was rehired after termination create "an inaccurate representation of the broader group of employees who were actually hired into Plaintiffs' positions," Opp. (R) at 5, but fail to give those figures.

1    Ultimately, however, the Court need not assign any weight to the numerical data at

2  this stage of the litigation because Plaintiffs here have raised a triable issue of fact without

3  relying on statistical data.

4    Summary judgment is DENIED on Plaintiffs Alfonzo, Cachero, Dacanay, King,

5  Pergamo, Rameriz, Tangonan and Valera's age discrimination claims.

6

7  **C.    Ramirez and Alfonzo's Family and Medical Leave Act Retaliation Claims (Tenth Cause of Action)**

8    Plaintiffs Alfonzo and Ramirez also assert that they were terminated for exercising

9  their rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601.

10  Alfonzo's position was eliminated ten days after she started a one month leave caring for her

11  husband, who had kidney and congestive heart failure, on November 22, 2004.  Ramirez was

12  on FMLA leave from August, 2004 until November 22, 2004, when she returned to work

13  with a doctor's note.   As set out above, Personnel Director Vickery rejected the note and

14  considered Ramirez "self-terminated" when she did not return with a new note within three

15  days.

16    An employer may not use the fact that an employee has taken FMLA leave against the

17  employee in an employment decision;  doing so gives rise to a claim for interference with the

18  exercise of FMLA rights in violation of 29 U.S.C. § 2615(a).  *Bachelder v. Am. W. Airlines,*

19  *Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001).  To establish such a claim, Plaintiffs must show

20  that they either took FMLA leave, or were eligible for leave and gave the Salvation Army

21  notice of their need to be absent from work, and that the leave was a "negative factor" in the

22  adverse employment decision.  *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1096 (9th

23  Cir. 2007); *Bachelder*, 259 F.3d at 1124-25, *citing* 29 C.F.R. § 825.220(c); *Foraker v. Apollo*

24  *Group, Inc.*, 427 F.Supp.2d 936, 940-41 (D. Ariz 2006) (*McDonnell Douglas* burden-shifting

25  approach not appropriate; plaintiff need only establish by a preponderance of the evidence

26  that she took FLMA leave, suffered adverse employment action, and the adverse action was

27  causally related to the leave).  They can prove their claim "by using either direct or

28  circumstantial evidence, or both."  *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir.

2003).  "Though the FMLA generally confers the right to reinstatement, an employer may still terminate an employee during her leave if the employer would have made the same decision had the employee not taken leave." *Gambini*, 486 F.3d at 1097.

Plaintiffs argue that the close temporal proximity between their exercise of FMLA rights and the adverse actions against them raises an inference of causal connection. *See Xin Liu v. Amway Corp.*, 437 F.3d 1125, 1137 (9th Cir. 2003), *citing Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).  In the Ninth Circuit, a plaintiff can raise an inference of a causal link exclusively on the basis of temporal proximity if the challenged action took place "close on the heels of" the protected activity. *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000);  *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002);  *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 507 (9th Cir. 2000)(requiring that the challenged action take place "within a reasonable period of time" after the protected activity).

The Salvation Army argues that it made its decisions about whose jobs would be eliminated in the reorganization in August through October, 2004, so that Alfonzo's November, 2004 leave could not have been a factor in her termination.  Plaintiffs countered at oral argument  that the Salvation Army's decisions about whose positions to eliminate and whom to rehire were an "ongoing process." Because the Salvation Army's own exhibits show variations over time in who was targeted for layoff when, *see* Phillips Decl. Exhs. A, C, Plaintiffs have raised a triable issue of fact as to when the final decisions were made, and therefore about causation.  Although Defendants argued at the hearing that there was a legitimate, non-discriminatory reason for the Salvation Army's termination of Ramirez, the *McDonnell-Douglas* burden-shifting framework does not apply.

Accordingly, Defendants' motion for summary judgment is DENIED as to Alfonzo and Ramirez's FMLA claims.

//

//

26

## II.    HIGGINS AND COUSINEAU'S CLAIMS (SECOND MOTION FOR SUMMARY JUDGMENT)

### A.    Cousineau's Age Discrimination Claim (Fourth Cause of Action)

Cousineau was 61 years old at the time he was transferred out of his position as the Residence Manager.  Cousineau testified that he heard rumors that the person getting his job, Travis Renfro, age 52, had held the position before and was a friend of Phillips; "the Majors" had told a court on Travis's behalf that Travis had a job waiting for him.  Cousineau claims that during his tenure at the Salvation Army, he occasionally heard "casual comments" that he was "getting too old," although he could not remember who made the comments or when. *Id.* at 39, 83.  He heard Diego Lopez, a Valencia Street thrift store manager, make comments that they should get "younger people in here who are more enthusiastic."   He claims he suffered disparate treatment on the basis of age.

Cousineau cannot make out a *prima facie* case of age discrimination.  To do so, he would have to show that he was over 40, performing his job satisfactorily, was discharged, and replaced by a younger employee with equal or inferior qualifications. *Coleman,* 232 F.3d at 1281.

The Salvation Army has produced unrebutted evidence that Cousineau did not perform his work in a satisfactory manner, either in the Residence Manager or Lead Sales Associate position. At the end of January, 2005, Beebe met with Cousineau to discuss problems with his performance, including his failure to stock or clean the canteen.  Beebe extended his 90-day probationary period to March 1. *Id.* at 132.  Cousineau was counseled for ripping up written reprimands of people living in the house.

Phillips testified he told Cousineau that it appeared he would not pass his probationary period, and offered him a transfer.  Cousineau accepted a transfer to the Valencia Street Store as a Lead Sales Associate on March 3, 2005, but fared no better.

Marlene Heller, his supervisor there, documented performance issues multiple times over the next several months for issues such as failing to open the store on time,  failing to count money as part of closing, negligent handling of cash, and signing altered time cards.

27

The Salvation Army also offers a legitimate, non-discriminatory reason for his discharge. From July 4-7, 2005, Cousineau failed to report to work. The Salvation Army contends that he did not contact his store manager, Diego Lopez.[23] When Cousineau reported to work on July 8, 2005, Lopez told him that pursuant to the Salvation Army's 3-day no-call, no-show policy, and because of his performance, he was being discharged. Phillips approved the termination. Phillips Decl. ¶ 9. Although the Plaintiffs have offered evidence that Heller might harbor discriminatory animus, Cousineau offers no evidence that Heller was involved in the decision to terminate Cousineau, and so has failed to raise a triable issue of fact on that ground. Defendants' motion for summary judgment is GRANTED as to Cousineau's age discrimination claims.

**B.      Claim for Disparate Treatment on the Basis of Disability By Higgins and Cousineau (Fifth Cause of Action)**

Neither Higgins nor Cousineau raises a triable issue of fact as to whether he suffered termination, or any disparate treatment, on the basis of disability.

Higgins had a back problem that prevented him from lifting. His resume noted he was a member of Disabled Veterans; he testified that during the application process, he told Heller that he couldn't lift anything, and asked whether he should mark it on the application. Heller said it was "not necessary" because he would not be lifting. Higgins Depo. at 38.

Cousineau contends he had a shoulder injury that prevented him from lifting heavy items. In January, 2005, he had outpatient surgery on his left shoulder. Although he alleges that he could not lift after the surgery, the doctor he visited for "DOT Recertification" stated he had no medical restrictions. Def.(2) Exh. O. He has never received a document from a physician indicating he had medical restrictions.

To make out a *prima facie* case of discrimination on the basis of disability, a plaintiff "must prove that he is a qualified individual with a disability who suffered an adverse employment action because of his disability." *Zivkovic v. Southern California Edison Co.,*

---

[23]   Cousineau testified that he called each day and spoke to assistant manager Maria Krueger because Lopez was not available.

302 F.3d 1080, 1090 (9th Cir. 2002)(citation omitted); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)(same). Section12102(2)(A) of the ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of the individual." Although "lifting" is considered a major life activity, 29 C.F.R. Pt. 1630, Appendix to Part 1630-Interpretive Guidance to Title I of the ADA, § 1630.2(I), Plaintiffs have not shown that their ability to lift is "substantially limited" – that is, "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii).

Although the existence of a disability requires an individualized assessment, *Albertson's, Inc. v. Kirkingsburg,* 527 U.S. 555, 566 (1999), courts have consistently held that restrictions on lifting heavy items do not *substantially* limit a major life activity. *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 540 (9th Cir. 1997) *and cases cited therein* (25 lb lifting restriction does not substantially limit major life activity that curtails ability to work); *Snow v. Ridgeview Medical Center*, 128 F.3d 1201, 1207 (8th Cir.1997)(a "general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability"); *Hodson v. Alpine Manor, Inc.*, 512 F.Supp.2d 373, 390 (W.D. Pa. 2007)(20 lb. lifting restriction is not disability within meaning of ADA); *Taylor v. Wal-Mart Stores, Inc.*, 376 F.Supp.2d 653, 660 (E.D. Va. 2005)(40 lb restriction); *Gordon v. MCG Health, Inc.*, 301 F.Supp.2d 1333, 1340-41 (S.D.Ga. 2003)(finding nurse not disabled when she was restricted from lifting more than ten pounds, engaging in repetitive bending, stooping, squatting, and overhead or shoulder-level work).

Here, Plaintiffs offer no specific evidence that they are substantially limited in lifting or working. In fact, a note from Cousineau's physician showed he had "no medical restrictions." Plaintiffs have therefore not shown they were disabled within the meaning of the ADA.

Moreover, Plaintiffs have failed to offer any evidence raising a triable issue of fact that they were terminated or treated differently because of their disabilities,[24] and have done nothing to rebut the Salvation Army's showing that they were terminated for well-documented performance problems.  Defendants' motion for summary judgment is GRANTED as to Higgins and Cousineau's claims of disparate treatment on the basis of disability.

**C.      Failure to Accommodate Disability (Sixth Cause of Action)**

Both Plaintiffs assert that their disabilities were not accommodated because they were asked to lift heavy items despite their limitations.  To make out a *prima facie* case of failure to accommodate under the ADA, plaintiffs must show that 1) they are disabled, 2) they are qualified, and (3) a reasonable accommodation is facially possible.  *Buckingham v. United States*, 998 F.2d 735, 739-40 (9th Cir.1993).  Again, Plaintiffs have not shown they are disabled within the meaning of the ADA.   In addition, they cannot show they were qualified because they failed to rebut the Salvation Army's evidence that their performance was inadequate.  Accordingly, Defendants' motion is GRANTED as to Cousineau and Higgins' failure to accommodate claims.

**D.      Higgins's and Cousineau's  Retaliation Claims (Eighth Cause of Action)**

Plaintiff Higgins claims he suffered retaliation after he objected to Defendants' instructions that he was to "crack down" on older workers.  Cousineau claims he suffered retaliation after he "made it known" that he would testify in favor of several older employees who had a suit pending against the Salvation Army.

To make out a *prima facie* case of retaliation, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two.  *Pardi v. Kaiser Foundation Hospitals,* 389 F.3d 840, 849 (9th Cir. 2004).  Opposing a discriminatory practice is a protected activity.  *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983).

---

[24] In fact, Plaintiffs' sole argument on this point is the sentence "However, Cousineau and Higgins were terminated because of their disabilities."  Opp. (H) at 5.

30

### 1. Higgins

Higgins claims he complained about comments that he should "crack down" or "be more aggressive" with older workers. Higgins testified that Jack Phillips told him he was being terminated in part because he did not "crack down" on older workers. Higgins Depo. at 105.[25]

The Salvation Army argues that even if Higgins raised a triable issue of fact as to whether he engaged in the protected activity, he has not shown a causal connection between his defense of the older workers and his discharge. But Higgins's allegation that Phillips told him he was terminated for his failure to treat older employees differently is "direct" – albeit disputed – evidence of retaliatory motive. Even though Higgins did not note the comment (or his earlier complaints about treatment of older works) in his journal, his testimony about Phillips' statement raises a triable issue of fact which the jury must be allowed to consider. Accordingly, summary judgment is DENIED as to Higgins's retaliation claim.

### 2. Cousineau

Cousineau alleges that he was discharged in retaliation for agreeing to testify for other Plaintiffs in this suit. To support this claim, he argues only that temporal proximity between the protected activity and his termination can give rise to an inference of retaliatory motive. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). The fact that the Salvation Army documented Cousineau's performance problems long before the protected activity undermines any inference the Court might draw from it. *See Bermudez v. Office Max*, 2007 WL 1299875, *3 (E.D.Cal. 2007) and cases cited therein (temporal proximity doesn't establish causation where performance problems documented before protected activity).

---

[25] The Salvation Army objects to Higgins's deposition testimony on the ground that it contradicts his contemporaneous journal entries and therefore "violates the Best Evidence Rule." The "Best Evidence Rule" does not stand for the proposition that contemporaneous notes are the "best evidence" of something that happened in the past. It requires parties to produce the original of a writing when its contents are at issue. Fed. R. Evid. 1002. Defendants' frivolous objection is OVERRULED.

1    More importantly, Cousineau has offered no evidence that any decision maker (or

2 even any specific Salvation Army employee) ever knew of Cousineau's support for the older

3 workers.  Cousineau offered conflicting testimony about his willingness to testify for the

4 older Filipina employees terminated in the December, 2004 reorganization.  At one point, he

5 testified that he told employees at the thrift store he would testify for the Plaintiffs.  *Id.* at

6 79-83.  However, he couldn't remember who he told or when, and admitted that he didn't

7 know any of those Plaintiffs.  *Id.*  At another point, he stated he did not tell anyone at the

8 Salvation Army that he had offered to testify for them.  *Id.* at 104-05.  "Essential to a causal

9 link is evidence that the employer was aware that the plaintiff had engaged in the protected

10 activity."  *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982).  Because Cousineau

11 has not shown that any decisionmaker knew of his alleged protected activity, he has not

12 raised a triable issue of fact as to causation.

13    Summary judgment is therefore GRANTED as to Cousineau's retaliation claim.

14

15 **III.    CLAIMS COMMON TO BOTH SUMMARY JUDGMENT MOTIONS**

16    **A.    Plaintiffs Alfonzo, Pergamo, Tangonan, Higgins, and Cousineau's**
    **Harassment Claims (Seventh Cause of Action)**
17
    Five Plaintiffs assert causes of action for harassment on the basis of  age, disability,
18
and/or national origin.  SAC ¶¶ 202-206.
19
20    To make out a harassment claim, a plaintiff must show 1) that she was subjected to

21 verbal or physical conduct on the basis of a protected characteristic; (2) that the conduct was

22 unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the

23 conditions of the plaintiff's employment and create an abusive work environment. *Vasquez v.*

24 *County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003)(race and sex);  *Sischo-Nownejad v.*

25 *Merced community College District*, 934 F.2d 1104, 1009 (9th Cir. 1001), *overruled on other*

26 *grounds*, *Dominguez-Curry*, 424 F.3d at 1041 (age); *Keller-McIntyre v. San Francisco State*

27 *University*  2007 WL 776126, *13 (N.D.Cal. March 12, 2007)(age and disability). The

28 environment must be "both objectively and subjectively offensive, one that a reasonable

person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Farragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

### 1. Alfonzo

Alfonzo alleges she was harassed by Heller on the basis of age. Opp. (R) at 21. Heller allegedly yelled comments like "young people work faster!" and "I need a more energetic staff!" in her presence and in front of customers. SAC ¶ 48; Alfonzo Depo. at 68-70 (Heller age comments). She yelled at Alfonzo for mistakes in front of customers, was critical of her, and gave her dirty looks. SAC ¶¶ 49-51; Alfonzo Depo. at 77-78. Defendants argue that Alfonzo did not subjectively perceive her work environment to be hostile because she admitted that she did not feel harassed. However, viewed in context, this "admission" shows Alfonzo did feel the conduct was severe and pervasive:

> Q:   Did you feel that she harassed you?
>
> A:   There was a time when that's what I wanted to think. There was a time.
>
> Q:   Do you still think that?
>
> A:   Now what I feel is that I just hurt inside. I think who all of them, who all of them did we fault against that they got rid of us. Until now I hurt inside. But I try to remove it from my mind, because I don't want to think about it, because thinking about it isn't good for me.
>
> Q:   But would you say at the time you worked there under Marlene Heller, that she harassed you in any way?
>
> A.   Me personally, I didn't think so. She did – she treated us differently, though, than the others who were higher up than us.

Alfonzo Depo. at 82.

Nonetheless, the harassment that Alfonzo alleges – two comments relating to age, and "rough," critical supervision – is insufficiently severe and pervasive so as to create an abusive working environment. *See Mannatt v. Bank of America, NA*, 339 F.3d 792, 798-799 (9th Cir. 2003)(noting that law prohibiting discrimination is not a "general civility code," and citing to *Vasquez v. County of Los Angeles*, 307 F.3d 884, 893 (9th Cir. 2002) as "finding no hostile environment discrimination where employee was told that he 'had a typical Hispanic

macho attitude,' that he should work the field because 'Hispanics do good in the field' and where he was yelled at in front of others").

**2.    Antonio Pergamo**

Pergamo alleges he was harassed because of his "inability to speak English." Opp. at 21. John Boatman, his immediate supervisor, was "hating me," "tormenting me" "because I was not speaking with English." Pergamo Depo. at 23. "It was a daily, daily, it's a daily, daily torment." Although his wife called Boatman to tell him to stop, *id.* at 24, Pergamo himself never complained, even though at one point Boatman's supervisor spoke Italian. *Id.* at 152.

This uncontradicted testimony, which provides some evidence of severe and pervasive harassment, can support a claim of harassment on the basis of national origin. At least one court has treated comments about an employee's English language ability as evidence of pretext in a race discrimination case. *Thanongsinh v. Board of Educ.,* 462 F.3d 762, 782 (7th Cir. 2006) (reversing grant of summary judgment where comment that plaintiff should "learn better English" could show animus "against persons for whom English is a second language").

An employer may be vicariously liable when harassment is perpetrated by a supervisor. *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007). However, where harassment does not culminate in a tangible adverse employment action, the employer may raise a defense with "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any … harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). As set out more fully below, the Salvation Army has pointed to no evidence showing that it exercised reasonable care to prevent unlawful harassing behavior other than sexual harassment. And although Pergamo failed to complain to anyone other than the harassing supervisor himself or take advantage of the Salvation Army's complaint procedure, he testified that he did not know of a complaint procedure. Pergamo Depo. at

122. The Salvation Army has failed to establish the first prong of the affirmative defense for the purposes of this motion, and there is a triable issue of fact as to whether Pergamo unreasonably failed to take advantage of preventative opportunities.[21]

### 3. Lourdes Tangonan

Tangonan's harassment claim is that she was "followed around by her supervisor during breaks." Opp. (R) at 21. But Tangonan makes no connection between the alleged following and her age, gender, national origin, or any other protected category. In fact, Tangonan admitted her supervisor, Joe Velasco, thought she was stealing (although denied that he had accused her of stealing once she confronted him in front of Phillips and Vickery). Tangonan Depo. at 24-25.

### 4. Higgins

Higgins claims he suffered retaliatory harassment and was reprimanded for failure to crack down on older workers. Higgins Depo. at 70-75, 105-106. These few alleged instances of criticism leveled at Higgins are not sufficiently pervasive or severe to create a hostile work environment.

### 5. Cousineau

Cousineau argues that Heller called him "'old' in the context of her criticizing his work performance" – Opp. (H) at 9 – presumably a reference to the incident in which Heller supposedly said "what are you, old?" when he was not counting cash fast enough. Cousineau Depo. at 65-66. Cousineau also said he heard "casual comments" in the workplace that he was "getting too old" but he just "laughed it off." *Id.* 39-40. These comments are insufficiently pervasive or severe to create a hostile work environment, and were also apparently not subjectively offensive.

//

//

//

---

[21] At the hearing, Defendants' counsel also argued that the Salvation Army offered a legitimate, nondiscriminatory reason for its failure to rehire Pergamo (his performance/ inability to operate the cash register). But his termination is irrelevant to his harassment claim.

35

### 6.  Summary

Summary judgment is GRANTED as to the harassment claims by Alfonzo, Tangonan, Higgins, and Cousineau, but DENIED as to Pergamo's claim for national-origin based harassment.

**B.  Failure to Prevent Discrimination and Harassment Claims By All Plaintiffs (Ninth Cause of Action)**

Each Plaintiff alleges that the Salvation Army failed to take reasonable steps to prevent discrimination and harassment from occurring, and to take corrective action to remedy the harassment.

The Salvation Army first argues that a failure to prevent claim will not lie where Plaintiffs have not shown they suffered discrimination or harassment. *Tritchler v. County of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004); *Trujillo v. North County Transit Dist.*, 63 Cal.App.4th 280, 288 -289 (1998) (state law). As set out above, however, Plaintiffs Alfonzo, Cachero, Dacanay, King, Pergamo, Ramirez, Tangonan, and Valera have raised a triable issue of fact as to whether they suffered age discrimination, and Pergamo has raised a triable issue on national origin harassment.[22]

The Salvation Army also argues that it has "policies prohibiting discrimination and harassment, and a complaint and separate grievance procedure," Motion MPA (R) at 2, which worked to prevent harassment and discrimination. However, the evidence the Salvation Army cites – at least as to those plaintiffs whose age discrimination and harassment claims will proceed to trial – does not discuss discrimination or harassment on the basis of race, national origin, or age (aside from a general prohibition on "illegal activities," Feldman (R) Exh. B, Employee Handbook (1999) at 42).[23] The only grievance procedure described is a general statement that the employee can consult his or her supervisor, Personnel Manager,

---

[22]  The complaint does not allege a failure to prevent retaliation.

[23]  A later version of the Handbook prohibits harassment "tied to such employee characteristics as age, religion, gender, marital status, race, nation of origin, disability, sexual orientation, etc.," Feldman (H) Exh. B, Employee Handbook (2003) at 53), but there is no evidence that Plaintiffs Alfonzo, Cachero, Dacanay, King, Pergamo, Ramirez, Tangonan, Valera or any supervisor received this version.

1    Center Administrator, or move up the chain of command in the event of a "misunderstanding

2    or problem." *Id.* at 38. There is no specific evidence that supervisors were trained on

3    discrimination and harassment on the basis of age or national origin. Major Jack Phillips

4    testified that all supervisors were required to complete an open-book test on "harassment,"

5    but the context makes it appear that this is solely sexual harassment. Phillips Depo. at 72-75.

6    Defendant Heller testified she does not recall receiving training on the subjects of race, age,

7    disability, national origin, or sex discrimination, or retaliation, although she did recall

8    receiving training on sexual harassment, FMLA leave, and accommodation of disability.

9    Heller Depo. at 107-108.[24] At the hearing, the Court invited defense counsel to identify

10   evidence in the record showing that the Salvation Army acted to prevent discrimination and

11   harassment other than sexual harassment, but counsel stated only that there were policies in

12   the handbook and that the Salvation Army had provided "many, many trainings" on the topic.

13       Accordingly, Plaintiffs have raised a triable issue of fact as to whether the Salvation

14   Army failed to prevent the discrimination and/or harassment allegedly suffered by Plaintiffs

15   Alfonzo, Cachero, Dacanay, King, Pergamo, Ramirez, Tangonan, and Valera, and summary

16   judgment is DENIED as to their claims. Summary judgment is GRANTED on Higgins and

17   Cousineau's failure to prevent claims.

18

19       **C.      Wrongful Discharge In Violation of Public Policy By All Plaintiffs
                   (Eleventh Cause of Action)**

20       The Salvation Army's sole argument for summary judgment on Plaintiffs' common

21   law claims for wrongful discharge in violation of public policy is that those claims must fail

22   because their statutory race, national origin, sex, age, and disability claims fail. *Crawford v.*

23   *MCI Worldcom Comm., Inc.*, 167 F.Supp.2d 1128, 1136 (S.D. Cal. 2001). But again,

24   because Plaintiffs have raised triable issues of fact as to whether they were terminated

25

26   _____
     [24] Phillips testified that he didn't believe Heller had had any formal training "other than going over
27   the handbook and going over Salvation Army policies as it relates to harassment, as it relates to
     discrimination, as it relates to hiring practices." Phillips Depo. 2 at 62-63. Phillips explained that
28   "going over the handbook" meant referring to the handbook when an employee had a complaint. *Id.*
     at 64.

37

because of their age and, in Higgins' case, in retaliation, public policy claims on that basis survive summary judgment. Accordingly, summary judgment is GRANTED on Plaintiff's Cousineau's wrongful discharge claim but DENIED as to all other Plaintiffs.

> ### D. Intentional Infliction of Emotional Distress Claims by Plaintiffs Alfonzo, Dacanay, King, Pergamo, Tangonan, Cousineau and Higgins Against the Salvation Army and Individual Defendants (Eleventh Cause of Action)

Plaintiffs Alfonzo, Dacanay, King, Pergamo, Tangonan, Cousineau, and Higgins allege causes of action for intentional infliction of emotional distress ("IIED") against the Salvation Army and all individual defendants.

The essential elements of a cause of action for intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress, (2) severe emotional distress, and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct. *Berkley v. Dowds,* 152 Cal.App.4th 518, 533 (2007); *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 155, n.7 (1987). Outrageous conduct is conduct "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 1001 (1993).

Defendants argue that Plaintiffs' claims are barred because the workers' compensation system is the exclusive remedy for injuries caused by an employer's work-related conduct. But the exclusivity of workers' compensation extends to intentional infliction of emotional distress only "so long as the conduct does not contravene public policy." *See Gibbs v. American Airlines*, 74 Cal.App.4th 1, 10 (1999); *Gantt v. Sentry Insurance*, 1 Cal.App.4th 1083, 1085 (1992). Here, because Plaintiffs allege that the offensive conduct was termination on the basis of age, in violation of public policy, the claims are not barred.

But "[t]erminating an employee for improper or discriminatory reasons, like many other adverse personnel management decisions, is insufficiently extreme or outrageous to give rise to a claim for intentional infliction of emotional distress." *Walker v. Boeing Corp.*,

218 F.Supp.2d 1177, 1190 (C.D.Cal. 2002), *citing Janken v. GM Hughes Elecs.*, 46

Cal.App.4th 55, 61, 79-80 (1996). As the California Court of Appeal explained in *Janken*:

> Managing personnel is not outrageous conduct beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of society. A simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged. If personnel management decisions are improperly motivated, the remedy is a suit against the employer for discrimination.

*Id.* at 80.   In fact, this Court rejected Plaintiffs' IIED claims as originally pled, on the ground

that that personnel management activity alone – even including termination for

discriminatory or improper reasons – was insufficient to rise to the level of outrageous

conduct.  July 6, 2006 Order Granting in Part and Denying In Part Motion to Dismiss, July 6,

2006, at 11-13.  After Plaintiffs amended their complaint to state that the conduct underlying

their harassment claims was the basis for their IIED claims as well, the Court held that they

could state claims for IIED because such harassing conduct is not considered "personnel

management activity."  Order Granting in Part and Denying In Part Defendants' Motion to

Dismiss the First Amended Complaint, October 13, 2007, at 6.

     In opposition to Defendants' motion for summary judgment, Plaintiffs Alfonzo,

Dacanay, King, Pergamo, and Tangonan did not spell out the factual basis for their claims.

Their Opposition argues they were long-term employees fired two weeks before Christmas

for their membership in a protected class, Opp. (R) at 21-22, and does not identify any other

conduct as the basis for the claim.  At oral argument, Plaintiffs' counsel clarified that the

harassing "comments" were a basis as well.  Plaintiff Cousineau argues that Heller called

him "old," and he lost his job because of his age, while Higgins states he was told to crack

down on older workers and lost his job for objecting to those instructions.  Opp. (H) at 10.

     The harassing comments alleged as to Alfonzo, Dacanay, King, Tangonan, Cousineau

and Higgins, insufficient to create a hostile environment, are not outrageous conduct beyond

the bounds of human decency.  Because only Plaintiff Pergamo has raised a triable issue of

fact as to whether he suffered severe and pervasive harassment, only he has raised a triable

1  issue of fact as to whether he suffered extreme and outrageous conduct that constitutes

2  intentional infliction of emotional distress.  Pergamo alleges harassment only by his

3  immediate superior John Boatman, not any one of the individual plaintiffs.  Nonetheless, the

4  Salvation Army can be vicariously liable for that harassment. *Lisa M. v. Henry Mayo*

5  *Newhall Memorial Hospital,* 12 Cal.4th 291, 297-98 (1995).

6      Accordingly, summary judgment is GRANTED on the IIED claims of Plaintiffs

7  Alfonzo, Dacanay, King, Tangonan, Cousineau and Higgins, and on Pergamo's claim against

8  the individual defendants, but DENIED as to Pergamo's IIED claim against the Salvation

9  Army.

10  **CONCLUSION**

11      Summary judgment:

12      • on all Plaintiffs' First, Second, and Third Causes of Action for disparate treatment

13  on the basis of race, national origin and sex is GRANTED.

14      • on Plaintiffs' Fourth Cause of Action, for disparate treatment on the basis of age, is

15  GRANTED as to Plaintiff Cousineau but DENIED as to Plaintiffs Alfonzo, Cachero,

16  Dacanay, King, Pergamo, Ramirez, Tangonan, and Valera.

17      • on the Fifth Cause of Action by Plaintiffs Ramirez, Cousineau and Higgins, for

18  disparate treatment on the basis of disability, is GRANTED.

19      • on the Sixth Cause of Action by Plaintiffs Cousineau and Higgins for failure to

20  accommodate disability is GRANTED.

21      • on the Seventh Cause of Action, for harassment, is GRANTED as to Plaintiffs

22  Alfonzo, Cousineau, Higgins, and Tangonan, but DENIED as to Plaintiff Pergamo.

23      • on the Eighth Cause of Action, for retaliation, is GRANTED as to Plaintiff

24  Cousineau and DENIED as to Plaintiff Higgins.

25      • on the Ninth Cause of Action, for failure to prevent discrimination or harassment, is

26  GRANTED as to Plaintiffs Cousineau and Higgins and DENIED as to Plaintiffs Alfonzo,

27  Cachero, Dacanay, King, Pergamo, Ramirez, Tangonan and Valera.

28

1   • on the Tenth Cause of Action by Plaintiffs Alfonzo and Ramirez for interference in
2   FMLA rights is DENIED.

3   • on the Eleventh Cause of Action, for wrongful discharge in violation of public
4   policy, is GRANTED as to Plaintiff Cousineau but DENIED as to Plaintiffs Alfonzo,
5   Cachero, Dacanay, Higgins, King, Pergamo, Ramirez, Tangonan and Valera.

6   • on the Twelfth Cause of Action, for intentional infliction of emotional distress, is
7   GRANTED as to Plaintiffs Alfonzo, Cachero, Cousineau, Higgins, Dacanay, King, Ramirez,
8   Tangonan, and Valera, and as to Plaintiff Pergamo against the individual defendants, but
9   DENIED as to the claim by Plaintiff Pergamo against Defendant Salvation Army.

11  A Case Management Conference is hereby set for March 31, 2008 at 1:30 p.m. in
12  Courtroom 12.

15  **IT IS SO ORDERED.**

17  Dated: 3/6/08

_____
THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT